(C.D. 2279)

HUDSON SHIPPING CO., INC. } *v.* UNITED STATES
BARRE FOOTWEAR CO.

United States Customs Court, Second Division

(Decided July 25, 1961)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Paul J. Gavin* of counsel) for the plaintiffs.

*William H. Orrick, Jr.*, Assistant Attorney General (*Henry J. O'Neill* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: An importation described as conveyor systems and identified by the manufacturer in Germany as Class 750 GP was classified by the collector of customs as articles having as an essential feature an electrical element in paragraph 353 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 353), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and duty was imposed thereon at the rate of 13¾ per centum ad valorem.

Plaintiffs claim that said merchandise is entitled to free entry as shoe machinery in accordance with the provision in paragraph 1643 of said act (19 U.S.C. § 1201, par. 1643), as amended August 6, 1956 (ch. 1021 § 1, 70 Stat. 1076).

The pertinent text of the statutes involved is here set forth:

Paragraph 353 of the Tariff Act of 1930, as modified, *supra*:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

 Batteries * * *

 * * * * * * *

 Other * * * _____ 13¾% ad val.

Paragraph 1643 of said act, as amended, *supra*:

Linotype and all typesetting machines, shoe machinery, copying lathes used for making rough or finished shoe lasts from models of shoe lasts and, in addition, capable of producing more than one size shoe last from a single size model of a shoe last, sand-blast machines, sludge machines, and tar and oil spreading machines used in the construction and maintenance of roads and in improving

them by the use of road preservatives; all the foregoing whether in whole or in part, including repair parts.

At the trial, plaintiffs introduced the testimony of Nathan Weiss, president of the Durkopp Corp. That concern imports, distributes, and installs conveyor systems, which are illustrated in a pamphlet received in evidence as plaintiffs' illustrative exhibit 1.

The defendant called as its witness, James Eardley, an examiner of merchandise in the office of the United States Appraiser in New York since 1947. Mr. Eardley has a degree of bachelor of science in engineering and also a civil engineer's degree. As examiner, he had become familiar with the merchandise in controversy over a period of 5 years.

Plaintiffs' witness, Weiss, displayed an intimate knowledge of the character and function of the subject merchandise, which he had sold for more than 4 years to shoe manufacturers. He had visited approximately 100 shoe manufacturing establishments in the United States and was well informed regarding the installation and practical operation of the article. Weiss stated that the illustration on page 3 of exhibit 1 depicted a 40-position conveyor in operation in a shoe factory; that, on page 4, a cross-sectional view showed how the work was dispatched by steel tote boxes. The tote boxes, which are attached to the conveyors, are directed by a dispatcher who operates a button panel shown on the cover page of exhibit 1. An electrical device automatically releases a box to a receiving platform, shown as figure 4 on page 4, from which the shoe stitcher operates. When the work contained in a tote box is finished, it is placed on a lower track of the conveyor, and it goes on to the next point. The control panel, illustrated on page 1 of exhibit 1, has 40 keys corresponding to the 40 sewing machines connected to the conveyor, and there is a direct line into the conveyor from every sewing or stitching machine. As stated by Weiss, "Each machine plugs into the conveyor, and each installation that I've been to—and I've been to every one of the installations—I've seen the machines hooked up to the conveyor." According to Weiss, the conveyor system in controversy was designed for the shoe industry, and he knew of no other use for the commodity.

Government witness Eardley was of the opinion that the sewing machines were plugged into a powerline rather than into the conveyor; that the sewing machines and the conveyor performed two separate and distinct functions; and that the conveyor was simply an automated form of economy in the industry.

In support of its contention that the imported equipment is not shoe machinery, the Government cites the case of *United States* v. *Laing Harrar & Chamberlin,* 21 C.C.P.A. (Customs) 235, T.D. 46763, wherein our appellate court held that certain shoe-treeing or shoe-

stretching devices were not entitled to free entry as "shoe machinery," within the meaning of paragraph 1643.

In the course of its opinion in that case, the court said, in part:

* * * In enacting the provision in controversy we conclude that Congress could not have had in contemplation every kind of machine that had anything to do with a shoe. It is probable that Congress, in putting shoe machinery on the free list, was prompted largely by a desire to cheapen the products of such machinery in this country.

Further, the court observed, "The imported machine, being a device for use in retail stores for stretching the shoe to meet the requirements of a particular customer, we do not feel that it falls within the shoe-machinery provision." The factual status of that case is so different from the facts in the case at bar that it offers little resistance to the claim of plaintiffs with respect to the conveyor system. Shoe-trees serve no purpose until the shoes are completed and ready for sale to customers. Conveyor systems on the other hand, such as we are concerned with here, have an immediate and intimate association with shoes in the process of fabrication. They add to the efficiency and economy of shoe manufacturing.

A case more in point is *P. H. Petry Co.* v. *United States*, 40 Cust. Ct. 443, Abstract 61541. In the opinion in that case, it was stated:

One witness testified for the plaintiff substantially as follows: That these machines are "About two yards by one yard table, I would say," weighing "roughly 800 to 1,000 pounds"; that "The first step in making a line of shoes is to determine from a master pattern the pieces of leather which are needed for the manufacture of the various sizes and widths of shoes. This machine has a pantograph system, and from a master model, it enlarges or reduces the contours of all the parts of the shoe"; that it operates on "Paper or a special cardboard, which is called pattern board, and which is used for—as a pattern for cutting the specific size of the leather piece"; "From the given master pattern, it makes not only the length enlargements but also the various widths for the various given—you know that shoe size 9, for instance, you have widths AAAA and so on—that's what it does."

After reviewing the facts in the case, reference was made to the decision of our appellate court in the *Laing* case, and the following was quoted from the opinion:

* * * It was the duty of the importer to sustain the claim in his protest by showing that it was not such a device as it was held to be by the customs officials, and to show that it was used in a manufacturing operation upon shoes. * * *

Following that quotation, we said:

It is our view, that the evidence, not contradicted, hereinbefore quoted, clearly establishes that the involved machine is and was used in manufacturing shoes. It is axiomatic that before one can have a shoe, one must have a pattern. This machine produces the pattern for the shoe to the exact size for both width and length. In the *Laing* case, *supra*, the appellate court quoted the following from the Summary of Tariff Information, 1929, at page 2254:

**Description and uses.**—In shoe machinery are included machines for cutting and sewing shoes and *for other manufacturing operations.* Many of these machines are highly specialized. [Italics supplied.]

To sustain the contention of the defendant herein, would require us to eliminate from the above quotation the words "for other manufacturing operations." The involved machine also answers the above "description and uses," in that it is a highly specialized machine. With the above information on shoe machinery before the Congress, it is clear that, in enacting the provision for shoe machinery, it did not intend to limit the provision to machines for cutting and sewing shoes, but intended the provision to cover and include, as well, machines for other manufacturing operations, such as those performed by the subject machine.

The *Laing* case, *supra,* was decided November 6, 1933. At that time, the only provision in paragraph 1643 on merchandise having a relationship to shoes was "shoe machinery." However, on August 6, 1956 (ch. 1021, § 1, 70 Stat. 1076) (19 U.S.C. § 1201, par. 1643), paragraph 1643 was amended to include after the words shoe machinery the following: "copying lathes used for making rough or finished shoe lasts from models of shoe lasts and, in addition, capable of producing more than one size shoe last from a single size model of a shoe last." This enlargement of paragraph 1643 seems to add emphasis to the statement of our appellate court in the *Laing* case, *supra,* that:

* * * It is probable that Congress, in putting shoe machinery on the free list, was prompted largely by a desire to cheapen the products of such machinery in this country.

It is also in the nature of legislative approval of our decision in the *Petry* case, *supra.*

Plaintiffs invite our attention to the case of *Geo. H. Diehl, Jr.* v. *United States,* 29 Treas. Dec. 29, T.D. 35589, wherein it was held that skiving machines, which were used in beveling edges of two or more pieces of leather to enable them to be glued or sewn together without increasing the uniform thickness of the parts, were held to be entitled to free entry as shoe machinery in paragraph 441 of the Tariff Act of 1913. Plaintiffs draw an analogy to the present case, in that the *Diehl* case stands for the principle "* * * that a machine could be shoe machinery without actually fabricating shoes." See also *United States* v. *American Express Co.,* 6 Ct. Cust. Appls. 494, T.D. 36124.

In *John V. Carr & Son, Inc., et al.* v. *United States,* 40 Cust. Ct. 292, C.D. 1996, this court was concerned with the classification of an appurtenance claimed to be part of a printing machine and, in the course of its opinion, the court made the following observation:

* * * Implicit in the definition of machinery is an aggregate of means and appliances to accomplish an overall purpose, and every device which promotes that purpose is a part of the entire machinery.

While an appurtenance for a printing press, which is normally employed to provide it with the material upon which it prints, does not, strictly speaking, perform any of the operations of printing, it, nevertheless, as has been here established, augments the capacity of the press to produce in volume. It is not feasible for a cylinder press to function efficiently and economically without the adjunct of an automatic feeder. Under the principles heretofore enunciated, it seems clear that an automatic feeder is a part of printing machinery.

We are not here dealing with the question whether a conveyor system is a shoe machine, but with the question of whether a conveyor system is shoe machinery.

In *United States* v. *J. E. Bernard & Co., Inc.*, 28 C.C.P.A. (Customs) 182, C.A.D. 142, the court was concerned with the tariff status of two so-called filters and, in the course of its opinion, made this observation, "* * * While the combined units may fall within the broad designation of machinery, it must be borne in mind that there is a distinction between 'machinery' and 'machines,' and that paragraph 372, *supra*, while providing for parts of machines does not provide for parts of machinery."

In another case, *Johnson Iron Works, Dry Dock & S. B. Co.* v. *United States*, 48 Treas. Dec. 237, T.D. 41132, this court, then the Board of General Appraisers, had for consideration the dutiable classification of a screw propeller. The following is quoted from the opinion in that case:

No direct claim is made that the propeller constitutes an integral part of the engine which operates it. It is claimed merely that it forms part of the "machinery" of the vessel. However, the provision invoked by importers calls for "machines or parts thereof." That there happens to be another provision in said paragraph 372 for "textile machinery or parts thereof," is significant. Evidently, Congress intended to differentiate the term "machinery" from "machine."

"Machinery" is not synonymous with "machine." Seavy v. Central Fire Ins. Co. (111 Mass. 540, 541); Fenson v. Bulman (17 Man. 307; 7 West L.R. 134, 137). The word "machinery" is of a much broader application and much more comprehensive and extensive. Worden-Allen Co. v. Milwaukee (171 Wis. 124; 176 N.W. 877, 878, and other cases cited in vol. 38, p. 330, Corpus Juris). The word "machinery" includes appurtenances necessary to the working of a machine. Bache v. Central Coal, etc., Co. (127 Ark. 397; 192 S.W. 225, 227, and other cases cited in said volume).

Likewise in volume 3, page 204, Second Series of Words and Phrases, we find the following:

According to Webster's International Dictionary a "machine" is any mechanical contrivance, while "machinery" is the means and appliances by which anything is kept in action or a desired result is obtained: * * *. (Tubbs v. Mechanics' Ins. Co., 108 N.W. 324, 326, 131 Iowa 217.)

And on page 203 of the latter work it is stated that—

According to Bouvier's Law Dictionary "machinery" is a more comprehensive term than "machine" and includes the appurtenances necessary to the working of a machine. (Citing Doty v. Oriental Print Works Co., 67 Atl. 586, 591; 28 R.I. 372, and numerous other cases.)

The significance of the above-quoted matter here is that we should give to the term shoe machinery a broader application than if the statute merely provided for shoe machines. As stated in the above quotation, taken from *Bache* v. *Central Coal, etc., Co.*, 127 Ark. 397, "The word 'machinery' includes appurtenances necessary to the working of a machine."

It seems obvious from the evidence in the case that conveyor systems are "appurtenances necessary to the working of a machine" and respond to the definition in Webster's International Dictionary in the foregoing quotation from the *Johnson Iron Works* case, "* * * a 'machine' is any mechanical contrivance, while 'machinery' is the means and appliances by which anything is kept in action or a desired result is obtained."

Upon the record herein, and for the stated reasons, we find and hold that the subject merchandise is entitled to free entry in paragraph 1643, *supra*, as amended, as shoe machinery. That claim in the protest is sustained and judgment will issue in harmony with the views above expressed.